CHEHARDY, Judge.
This is a lawsuit by Wendell P. Harris, Jr.,[1] a former partner of the defendants, to recover on a promissory note they gave him as payment for the purchase of his partnership interest. The defendants reconvened, alleging the plaintiff breached his fiduciary duty to them and that his conduct vitiated all agreements between the parties. Further, they sought to hold him liable for debts incurred by the partnership after the date his partnership interest terminated.
After trial of the matter, the district court ruled in favor of the plaintiff, granting him judgment in the amount of the promissory note, plus interest, attorney’s fees and costs. The reconventional demand was dismissed.
The defendants then filed a motion for new trial. In denying that motion, the trial judge stated, “This Court agrees that Wendell Harris owed a high duty to refrain from obtaining any personal advantage over his partners. Finding no breach of his duty, this Court must deny the Motion for New Trial.” Defendants have appealed.
The partnership, entitled “Woodland Terrace, Ltd.,” was formed in April 1972 by Albaro Martinez, Wendell Harris, Jr., Alvin Baham and W. Bruce North, Jr.[2] Each partner had a 25% interest, and each was listed in the articles of partnership as both a general partner and a limited partner. The partnership agreement delineated no specific duties for the individual partners, *1218 and stated the purpose of the partnership to be “acquiring, owning, improving, operating, managing or otherwise controlling real estate for the account of itself and for the beneficial interest of others.”
The underlying reason for the formation of the partnership was to obtain financing for development of an apartment complex in Baton Rouge, to be called Woodland Terrace Apartments. Partner Albaro Martinez was to be contractor on the project, through his construction company, Villa Homes. The partnership arranged interim financing for the project, and construction began in April 1972. By March 1973, the project was substantially complete and the city of Baton Rouge issued permits for partial occupancy.
During construction of the apartment complex, Wendell Harris was employed by Villa Homes for six or eight months as a $200-a-week laborer on the jobsite. In December 1972, his job was terminated by Jim Brown, Villa Homes’ job superintendent. In January 1973, Harris sold his partnership interest to the other three partners. The sale was conditioned upon the purchasers’ obtaining permanent financing for the property in the amount of $1.8 million. In exchange he received a cash payment plus two notes, for a total of $50,000 consideration. In addition, Harris received a hold-harmless and indemnification agreement from the partners.
In December 1973, Harris was contacted by one or more of the partners and was asked to renegotiate the sale of his interest, for they had been unable to obtain permanent financing in the amount planned. He agreed, and was given a new hold-harmless and indemnification agreement, $4,000 cash and an $18,000 promissory note, which is the note made the basis of this lawsuit. The note was due-on December 28, 1974; demand for payment was made in January 1975; and suit was instituted in September 1976.
The reason underlying the defendants’ refusal to pay the note is the discovery of extensive problems in the construction, requiring repairs costing approximately $102,-000.[3] On appeal, the basic position of the defendants[4] is that Harris, who lived in Baton Rouge and worked on the jobsite every day until his termination in December 1972, either knew or should have known of the deficiencies in the construction. They contend the sale of his partnership interest to them, without disclosure of the construction problems, was fraudulent and a breach of his fiduciary duty to the partnership. They accuse him, in effect, of profiting at their expense.
Alvin Baham was the only defendant partner available to testify at trial, since North was dead and Martinez was absent. According to Baham, Martinez had suggested in early planning for the complex that the contractor’s performance bond be waived, saying he would hire Harris to work on the job and there would not be any need for a bond. Baham testified his intention in making Harris a partner was so they could have someone in Baton Rouge to look after their interests. (Baham and North were residents of the New Orleans area.) He felt everyone’s interest would be protected by having two partners (Martinez and Harris) on the jobsite.
Baham himself was not in the construction business and had never been involved in a construction project. He admitted he never discussed details about the project regarding the specifications, although he visited the site about every six weeks and saw Martinez, Harris and Brown, the job superintendent, on those visits.
Baham testified he did not learn about the changes made in the specifications until the spring of 1974, when he began taking a *1219 more active interest in the complex because of their problems in finding tenants. Oscar Kramer, a new manager of the complex, first brought the deficiencies to Baham’s attention.[5]
Baham said he had looked to Harris as a check and balance on Martinez, because he felt that Harris, in looking after his own interest, would be looking out for Baham’s as well. He admitted he never contracted with Harris to construct the apartments or to oversee the construction. He stated he had discussions with Harris as a partner to be sure everything was done in accord with the plans and specifications, but he could not recall the substance of those conversations. According to Baham, he understood — through Martinez — that Harris initiated the movement to buy out Harris’ interest in the partnership.
Harris testified that he was a licensed real estate broker, but had never worked on or been around construction such as this, and did not know anything about construction. He said he never read the plans and specifications for the project, and as far as he knew the construction was good. He knew there was no insulation in the walls and ceilings, but did not know it belonged there; he did not know what grades of lumber were used, or what sizes of flooring should have been used. He testified that he assumed he had been made a partner because they wanted somebody in Baton Rouge to represent them and to look after the project indirectly; however, he thought the architect was supposed to be inspecting the project. He testified it was not his job to keep an eye on anything. He denied that he ever represented to any of the other partners (meaning North and Baham) that the project was being built in accord with the plans and specifications.
Harris testified further that he sold his partnership interest, at Martinez’ request, after Martinez’ job superintendent terminated his job because, “I feel like I had been treated, you know, not consulted or anything like this, I figured, you know, just go ahead and sell it, sell my part.” He also denied that he had any authority at all to represent the partnership. He could not recall signing the building contract with Martinez, but admitted the signature on it was his. Similarly, he identified his signature on the Notice of Acceptance, but could not recall signing it. He stated he had nothing to do with the project after termination of his partnership interest, despite the fact that the Notice of Acceptance, which he apparently signed, was dated two months after he sold his interest. He could not explain how this happened. To his knowledge, he testified, he did not have the authority to sign such a document.
James E. Brown, Martinez’ job superintendent, testified by deposition that Wendell Harris worked as a laborer on the job, stocking Sheetrock and moving lumber. Brown said it was Martinez’ job to insure the building was built in accord with the plans and specifications, and it was Martinez who made the changes from the specifications. Brown knew of no responsibility on the part of Harris for changes; as far as Brown was concerned, Harris had no power to make changes in anything. Brown was *1220 aware of the changes Martinez was making, and questioned some of them, but Martinez had final approval.
The architect for the project, Thomas Gilbert, testified his engagement as architect was limited to drawing up the plans and specifications, and his contract did not include supervision of the construction. He testified that where the contractor is also an owner and is in control of the property, the architect has little control over the project other than to insure it meets state and city codes. As long as the building is structurally efficient and meets city codes, the architect’s duty to his client has been met, he said. Under these circumstances, he stated, he does not feel it necessary to comment on changes made in the specifications, unless they are violations of code requirements.
On appeal, defendants contend first that the sale of Harris’ interest should be rescinded due to an error of fact as to the principal quality of the object (the apartment complex). Baham testified that when he agreed to buy out Harris’ interest he thought he was buying a project built in accord with the specifications.
LSA-C.C. art. 1823 states:
“Errors may exist as to all the circumstances and facts which relate to a contract, but it is not every error that will invalidate it. To have that effect, the error must be in some point, which was a principal cause for making the contract, and it may be either as to the motive for making the contract, to the person with whom it is made, or to the subject matter of the contract itself.”
In order for a mistake or error to invalidate a contract, it is necessary that the error be in some point which was a principal cause for making the contract, and that the other party was apprised, or had reason to know, that such point was the principal cause for making the contract. Talley v. Blake, 322 So.2d 877 (La.App. 1st Cir. 1975).
Defendants have confused the two different contracts involved in the construction of the apartment complex. One contract was a partnership for the mutual financial advantage of the partners; the other was a contract with a builder to build an apartment complex that would be of sufficient quality to bring in tenant occupancy at projected levels insuring financial profit to the partnership.
A project built in accord with the specifications may have been the motive in the partnership’s contract with Villa Homes for construction of the project. However, the principal motive in buying Harris’ interest in the partnership, we infer from the totality of the evidence, was to obtain for the remaining three partners a larger share of the anticipated profits.
Further, if “a project built in accord with the specifications” was the defendants’ principal motive, this was not adequately communicated to Harris.
Defendants next contend that Harris owed a fiduciary duty to his partners which he breached because he knew or should have known of the deficiencies in construction. Alternatively, they contend he is guilty of “negligent ignorance” because he had actual knowledge of elemental facts but failed to inquire into their significance.
Unquestionably, Louisiana law imposes a duty on a member of a partnership to conduct no activity contrary to his fiduciary duty and which is prejudicial to the partnership. LSA-C.C. art. 2809. The trial judge concluded Harris had not breached this duty. This is a factual finding which this court may not reverse unless it is clearly wrong. See Canter v. Koehring Company, 283 So.2d 716 (La.1973), and its numerous progeny.
We find no manifest error in the trial judge’s conclusion. The burden of proof was upon defendants to prove fraud on Harris’ part. While he was on the job-site every day, his testimony—which the trial judge obviously found credible—establishes that he had no special knowledge of construction. He was unaware of the requirements of the specifications, or of deviations therefrom. The defendants were *1221 equally capable of noting unauthorized changes.
Although Baham testified he expected Harris to serve as a check on Martinez, there is no indication he ever communicated or discussed this expectation with Harris.
Defendants had a year between the making of the first note, and the substitution for it by the second note, within which to discover the project had not been built according to the specifications. During that year, Harris was no longer involved in the project. There is nothing to indicate he obtained knowledge of the deviations from the specifications prior to accepting the second note.
Indeed, as plaintiff contends in his brief, by the time defendants restructured their buy-out of his partnership interest, they should have had more knowledge about the completed project and financial condition than did Harris.
For the foregoing reasons, we conclude that the promissory note was given for good and valid consideration and, therefore, we affirm the judgment of the trial court.
AFFIRMED.

. Freddie D. Harris, the other plaintiff, is the wife of Wendell Harris and joined in the suit as a plaintiff because the promissory note is an asset of the marital community.

. North died before trial of the matter and Bruce A. North, Testamentary Executor of the Succession of W. Bruce North, Jr., was substituted in his place.

. Plaintiff-appellee disputes that these were “repairs,” and contends rather they were simply items from the original construction left unfinished in March 1973, when Brown, the job superintendent, left the job.

. Martinez was served with the lawsuit but never answered, and could not be located to testify at trial. However, his deposition, filed in the record of another proceeding arising out of the building of the apartments, was submitted into evidence.

. William L. Bowman, the defendants’ expert in structural design, testified he found the following changes from the specifications, and that all these substitutions were a downgrading from the specifications:
SPECIFICATIONS SUBSTITUTION COST DIFFERENTIAL
(all less than
original price
under contract)
brick firewalls concrete block $15,000
ceramic tile in bath-
rooms vinyl & wood-base
tile 4,900
catch basins and drain-
age pipes in parking
eliminated 5,200
5-ply built-up roofing 3-ply 53,600
copper tube termite
treatment system plastic tube
SPECIFICATIONS SUBSTITUTION COST DIFFERENTIAL
(all less than
original price
under contract)
1" rigid insulation 12,800
pea gravel concrete in
second story floors eliminated 47,200
weatherstripping eliminated 3,800
%" plywood roof
sheathing W plywood 38,400
94" plywood floors %" plywood 57,600
# 2 grade lumber utility grade 88,000
insulation in floors
and walls eliminated between
first and second
floors; substan-
tially reduced in
roofs and walls 28,600
bar cabinets eliminated 12,800
certain inner doors eliminated 4,800